# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
January 22, 2002 Session

## MOHAMED F. ALI v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Washington County**
**No. 26033     R. Jerry Beck, Judge, By Interchange**

---

**No. E2001-00183-CCA-R3-PC**
**April 11, 2003**

---

The petitioner, Mohamed F. Ali, appeals from the judgment of the Washington County Criminal Court denying him post-conviction relief from his convictions for rape and attempted bribery. He is serving an effective sentence of fifteen years in the Department of Correction. The petitioner contends that the post-conviction court erred in (1) applying incorrect law governing judicial bias, (2) finding that the convicting trial judge was not biased against him, (3) excluding evidence of judicial bias, (4) refusing the petitioner's discovery requests regarding the issue of bias, and (5) denying the petitioner's claim of ineffective assistance of counsel. We affirm the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Janie L. Lindamood, Johnson City, Tennessee, for the appellant, Mohamed F. Ali.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Victor J. Vaughn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner, a medical doctor, was convicted of raping a drugged patient in his office and of attempting to bribe her to drop the rape claim. A concise summary of the relevant facts comes from an earlier appeal in which the sentences were affirmed.[1]

> The defendant is a physician. In 1989, one of his female patients, the victim, went to the defendant to have her cholesterol checked. After taking a blood sample, the defendant put on a rubber glove, pulled up the victim's dress, and placed his hand inside her underwear. The defendant then administered an injection which he explained was for muscle spasms and directed her to the examination table. The victim described her state afterwards as in a "dream world" or "in la la land." The defendant removed the victim's underwear, fondled her privates, and stated that he would have to show the victim how she and her husband should have intercourse. The victim remembered that the defendant unzipped his pants and placed his penis into her vagina and that, when she tried to pull away, he forced her back. She described the incident was "over quickly." When the victim stepped away from the examination table, she noticed what appeared to be a semen stain on the paper covering. She recalled that she was unable to find her underwear. The defendant then directed her to the reception desk to make another appointment. After leaving the office, the victim stopped at a convenience market and called her husband. When her husband arrived at the market, he found that her speech was slurred. The victim informed him that she had been raped

---

[1]We note that the petitioner's brief fails to comply with the requirements of the rules of appellate procedure. The post-conviction record contains seven volumes of testimony and exhibits. The convicting trial record contains over thirty volumes of various sizes. Pursuant to Rule 27(a)(6), T.R.A.P., the appellant is required to present a statement "setting forth the facts relevant to the issues presented for review with appropriate references to the record." The following is the petitioner's statement of the facts:

> Original facts were detailed by this Court in State of Tennessee v. Mohamed F. Ali, 1996 Tenn. Crim. App. LEXIS 617 @ *2-5 (copy attached) and also by the lower court. R, II @ 220-25; T, I @ 18-23
>
> Post-conviction facts were detailed by the lower court. R, II @ 225-29; T, I @ 23-32.
>
> For purpose of brevity, Ali relies on the statements of the facts already in record, supra.

The argument portion of the brief is written in a cryptic style that in many instances defies understanding unless the record is searched and reviewed in detail to determine the pertinent facts and trial court actions. Arguments are often conclusory or tangential. The brief purports to raise five issues but many things are argued. Given the nature of the brief and the task at hand, we will focus our analysis on the five issues and refrain from pursuing arguments that are tangential, irrelevant, or waived.

by the defendant and could not find her underwear. The matter was then reported to the police.

Officers later found a semen stain on the examination table. Testing indicated that the defendant could have been the source of the semen. Later, the victim's husband met with the defendant privately. A recording of the conversation confirmed that the defendant claimed to have given the victim an injection dosage of a steroid which he contended had caused her to imagine that the rape had occurred. The defendant stated that he had contacted his insurance company and had been authorized to pay $ 20,000.00 in cash for the wrongful injection. The defendant had also offered to pay for psychiatric counseling for the victim.

Testimony by a representative of the defendant's malpractice insurance carrier contradicted the defendant's claims. A blood and urine analysis of the victim contradicted the defendant's claim that he had administered depo-medrol, a steroid; instead, tests indicated a high level of hydroxyzine, a sedative used as a pre-anesthetic. Expert testimony indicated that the drug could make one physically helpless.

State v. Mohamed F. Ali, Nos. 03C01-9802-CR-00065 and 03C01-9809-CR-00310, Washington County, slip op. at 2-3 (Tenn. Crim. App. Aug. 24, 1999). The convictions were affirmed in a previous appeal. See State v. Mohamed F. Ali, No. 03C01-9405-CR-00171, Washington County (Tenn. Crim. App. Sept. 26, 1996).

After he was convicted, the petitioner ended his retained counsel's representation and represented himself through the motion for new trial hearing and sentencing. He raised the issue of ineffective assistance of counsel and presented several witnesses at the new trial motion hearing. Counsel were appointed for the appeal, but they did not raise the issue of ineffective assistance of counsel in the appeal.

The post-conviction hearing was essentially limited to testimony on the issues of judicial bias and the ineffective assistance of appellate counsel. Relative to ineffective assistance of trial counsel, the post-conviction court noted that the petitioner represented himself at the motion for new trial hearing and raised the issue of counsel's effectiveness at that time. It concluded that the issue was, therefore, previously determined and that if appellate counsel should have raised it in the appeal, the only record would have been the transcript of the motion for new trial hearing. Thus, the relevant record for us to review consists of the post-conviction hearing transcript and the motion for new trial hearing transcript. We also take judicial notice of the convicting trial record on appeal.

## POST-CONVICTION HEARING

Rev. Donald P. Strother testified that he talked by telephone with Judge Lynn W. Brown, who presided at the petitioner's trial, two or three weeks before the petitioner's sentencing. He said he told Judge Brown that he had listened to the trial and that he thought a legally trained mind could see the lack of evidence and, at least, give the petitioner a light sentence. He said Judge Brown told him to come to the hearing to say what he wanted to say for the petitioner but also said, "you are not going to like what I'm going to do about Dr. Ali." Rev. Strother acknowledged that he also wrote Judge Brown a letter on the petitioner's behalf but that Judge Brown returned it without reading it. He denied going to Judge Brown's office.

Judge Lynn W. Brown testified that he presided at the petitioner's 1993 trials for rape and bail jumping. He recalled Rev. Strother coming to his office between the petitioner's trial and sentencing. He knew Rev. Strother, who had previously served as grand jury foreman when Judge Brown had been an Assistant District Attorney General. Judge Brown stated that Rev. Strother wanted to talk to him about the petitioner's case and that he told Rev. Strother such a discussion was improper. However, Rev. Strother persisted, telling him that the petitioner had accepted Jesus and was innocent.

Judge Brown testified that he told Rev. Strother that nothing could be considered outside of court. He acknowledged saying to Rev. Strother that the Reverend was not going to like what Judge Brown was going to do, but he denied having his mind made up about sentencing at that time. Judge Brown indicated that his statement was partly in response to Rev. Strother's claim of the petitioner's innocence, given the overwhelming evidence of the petitioner's guilt.

Judge Brown was questioned about other events which the petitioner contends show his bias against the petitioner. Judge Brown acknowledged telling a bondsman that what he needed was a "good used camel" relative to the bondsman's attempts to return the petitioner from Egypt. Judge Brown said that he was intending humor directed at the bondsman given the futility of his attempts.

Judge Brown acknowledged that he was an acquaintance of Dr. Jan Allen DeWitt who testified at the motion for new trial hearing at which the petitioner represented himself. He acknowledged eating lunch with Dr. DeWitt on the day he testified. Judge Brown explained that he went to lunch with his court reporter. When Dr. DeWitt arrived and no seats were available, he invited Dr. DeWitt to join them. Judge Brown also said he saw no reason to disclose the fact that Dr. DeWitt was a personal acquaintance.

Judge Brown identified a transcript of a hearing for bond for the petitioner pending appeal. The transcript reflects that the petitioner's counsel sought Judge Brown's recusal because the petitioner had filed a complaint against him with the Court of the Judiciary. Regarding the complaint, Judge Brown stated, "I have never seen so much garbage, untruth, lies and deceitfulness. And the Court of Judiciary determined that that was about the substance of it, it's been dismissed."

After hearing argument from counsel, with references to the evidence at the trial and sentencing, Judge Brown denied bond, concluding that a risk of flight existed.

Judge Brown denied harboring any personal prejudice or bias against the petitioner. He denied basing any rulings in trial or sentencing in any sense on personal prejudice or bias against the petitioner.

Ronald R. England testified that he was the sheriff in Washington County in 1994. He said he continued to hold the petitioner in the local jail after sentencing at the request of Rev. Strother. He said Judge Brown then told him to send the petitioner to the state penitentiary when the next opening occurred.

Randall Reagan testified that he handled the petitioner's case on appeal through his contract appellate work for the Public Defender's Office. He said he reviewed the entire record and had numerous telephone conversations with the petitioner, discussing the case and strategies. He concluded that the record was not sufficient to raise the issue of ineffectiveness of counsel on appeal and told the petitioner the issue was better left for a post-conviction claim. Mr. Reagan did not think this was bad advice and noted appellate decisions saying the practice of raising ineffective assistance of counsel on direct appeal was "fraught with peril." He believed that the main issue for appeal related to whether a proper waiver of counsel existed for the petitioner's new trial motion and sentencing. He did not review the record for ineffective counsel purposes and saw no glaring error committed by trial counsel.

David Bautista, the District Public Defender, testified that his office was appointed to represent the petitioner on appeal. He said they review the case, identify issues available for the appeal, and note them on a form. The petitioner's form has notes that the petitioner complained about the ineffective assistance of counsel. Mr. Bautista was aware that Mr. Reagan did not include the ineffective counsel issue in the brief. However, Mr. Bautista did not believe sufficient grounds existed to pursue the claim.

Mr. Bautista recalled the hearing before Judge Brown regarding the petitioner getting bond pending appeal. He said Judge Brown seemed upset or mad for no apparent reason.

James T. Bowman, the petitioner's trial counsel, testified that he saw nothing in Judge Brown's demeanor toward the petitioner during the trial that would have led him to believe any preconceived bias or prejudice existed. The trial court barred further testimony from Mr. Bowman regarding his representation of the petitioner, noting that the issue of ineffective assistance of trial counsel was previously determined and that appellate counsel would only have had the transcript of the motion for new trial hearing.

# MOTION FOR NEW TRIAL HEARING

The petitioner, acting as his own counsel, called numerous witnesses at the hearing on the motion for new trial. His primary complaints against his trial counsel dealt with the failure to develop and present existing evidence on his behalf, obtain expert assistance, and obtain existing evidence to impeach the victim.

Dr. Jan Allen DeWitt testified that he examined the victim on the day in question. He saw no bruises, no changes in her flesh, nor dried secretions. He said he found nothing "positive." He said that her behavior was tense and "consistent with having something awful happen however." Dr. DeWitt admitted it would be difficult to tell whether a drug or something else was affecting her demeanor, but he said he saw no sign that the victim was under the influence of something. Dr. DeWitt was subpoenaed by the state but not asked to testify. He was not contacted by trial counsel.

Johnson City Police Sergeant Sam Reed was the chief investigating officer on the case. He testified that they had an open file policy and that Dr. DeWitt's report was in the file. He recalled being at the emergency room for two or three hours while the victim was examined. Dr. DeWitt gave him a sex crime kit for the victim, which he sent to the FBI. Sergeant Reed said that a college student accompanied him.

Sergeant Reed testified that he searched the petitioner's office, primarily the examining room in question. He took swabs and smears from various places and took the paper from the top of the examination table. He sent the various items to the FBI but was not aware that the swabs and smears had not dried enough for use until an FBI agent testified at the trial.

Sergeant Reed also acknowledged having to obtain three separate blood samples from the defendant. The first two did not result in any FBI testing, but the last one did.

Danny Pyke testified that he was a former officer and had accompanied Sergeant Reed to the petitioner's office. He recalled the paper being taken from the examination table. He acknowledged being indicted for prescription forgeries and receiving pretrial diversion. However, he denied any wrongdoing.

Sarella Patel testified that he had been a deputy jailer for the Washington County Sheriff's Department in 1992. He acknowledged providing information to the District Attorney General a day or two before the petitioner's trial that was based upon what the petitioner had told him. He testified at the petitioner's trial on behalf of the state.

Nechia Ann Douglas testified that she took a Physician's Desk Reference (PDR) to the petitioner's trial attorney at the courthouse during the trial and retrieved it afterward. She said that Mr. Bowman's secretary, Martha Perkins, told her that she would receive medical records from Blue Cross/Blue Shield, but she never received any.

Vickie Wise testified that she had been the petitioner's secretary and medical assistant. She said she tried to get Mr. Bowman's office to get a ledger card from Jones & Jones law firm in Greeneville. Mr. Bowman's secretary kept saying that they would. Ms. Wise said she called them for weeks, but they did not get any ledger cards. She identified a card and said that it was the day she "worked Ms. Dugger out," referring to the victim's daughter, and that she had talked with the victim and the victim had paid on her account. She said this was important because the victim denied paying anything on the day in question, claiming that she did not have time. She acknowledged that she testified at the petitioner's trial regarding the victim making a payment and the ledger card.

Ms. Wise testified that she gave Mr. Bowman a list of patients that had been in the office that day and medical records. She said that a week before trial, Mr. Bowman asked her for information regarding Depo-Medrol and Vistaril but that she told him that she was not qualified. She also stated that she relayed to Mr. Bowman the petitioner's request for an independent DNA and genetics expert. She said Ms. Perkins, Mr. Bowman's assistant, complained about and was frustrated over the short period of time she was allowed to handle the case, mentioning that Mr. Bowman had given it to her one month before trial.

Christy Leah Anderson testified that she had no problem at all in getting ten boxes of documents from Jones & Jones law firm after the trial. She acknowledged that she had an affair with the petitioner for three years.

Martha Davis Bowman testified that she was a certified paralegal who had worked for Mr. Bowman for two years at the time of the hearing. She recalled being informed about records in Greeneville, but she remembered that her office had a copy of the particular ledger card of interest that was used at trial. She said that they believed that the copy showed the victim had paid.

Ms. Bowman acknowledged that the petitioner provided a specific name of a DNA expert, Jack Ralley, and a neurologist. The neurologist treated the petitioner before the petitioner left the country before his trial. The petitioner wanted him to testify about the petitioner's state of mind before he left and the medications he prescribed for the petitioner.

Ms. Bowman testified that the petitioner told her he had "important character" witnesses and provided her with the names. She did not recall whether any of the character witnesses were called at the trial. Also, she did not remember complaining before trial of having too little time for the case.

The petitioner testified and identified various exhibits. He had photographs of his office and the examining room in question. He submitted medical records and lab tests of patients that were seen by him on the day in question, noting that he was questioned at the trial regarding other persons who were examined in that room. He submitted a letter and an article by Dr. Donald C. Thompson dealing with certain drugs causing sexual fantasies and hallucinations, noting that the victim was prescribed one of the drugs discussed. The petitioner presented letters from willing character

witnesses, both physicians and nonphysicians. He had documents from persons who had information regarding the victim. The petitioner presented financial records, stating that they would show that he left assets for his wife and child. He noted that he was cross-examined about his fleeing to Egypt and not supporting his family.

On cross-examination, the petitioner said that he discussed character witnesses with Mr. Bowman, but he denied agreeing with him that character witnesses would not be used. The petitioner said that he also gave Mr. Bowman the names of two people who were willing to testify regarding DNA. He did not believe Mr. Bowman had the scientific knowledge to cross-examine a DNA expert. He said he urged Mr. Bowman many times to obtain such an expert. He explained that such an expert could cast doubt upon the state's expert who identified semen from the examining room as coming from the petitioner. When asked if he had told Mr. Bowman that he had had sex in many places in that office and that the semen could have been his, the petitioner said "not in that particular room, no." He also acknowledged that he told Mr. Bowman that he and his wife were trying to conceive a child, that he had been doing sperm counts on himself, and that the semen may have come from that. He denied getting Christy Anderson to tell Mr. Bowman just before trial that she and the petitioner had sex on the examination table that night. He also denied having sex with Ms. Anderson on that table that night.

The petitioner acknowledged prescribing Xanax for the victim and that the FBI test of the victim's blood did not find any Xanax. However, he referred to "flashbacks, hallucinations" that could occur.

The petitioner submitted a copy of his civil complaint against Mr. Bowman, stating that it contained the various complaints he had about Mr. Bowman's representation.

The state called Mr. Bowman as a witness. Mr. Bowman had practiced for twenty-five years, primarily in criminal defense. He was hired by the petitioner when the petitioner was charged with rape and bribery and also represented the petitioner when he was indicted on Medicaid and Blue Cross fraud charges. He said that a lot of people communicated with him on the petitioner's behalf and some offered to be character witnesses. Mr. Bowman testified that he had difficulty getting the petitioner to focus on what he thought was important regarding the case. He said the petitioner often talked about filing lawsuits and often tried to enlist Mr. Bowman's help for other prisoners.

Mr. Bowman believed that the fact the petitioner was depressed when he fled the country was a nonissue. He did not think anyone would doubt his being depressed and noted that witnesses testified about it. He saw no need to bring in the neurologist who treated the petitioner.

Mr. Bowman saw no need for a DNA expert. He said the petitioner never denied that the semen could be his and the petitioner had an explanation as to why his semen would be found in the room. He said the petitioner told him that he routinely conducted sperm counts because he was trying to have a child. Mr. Bowman said that closer to trial, the petitioner said he had sex in the room with Christy Anderson. Mr. Bowman stated that the petitioner also said that he had sex all

over his office with various people and that it would not be unusual to find his semen in the office. Mr. Bowman said he told the petitioner that he would have him testify regarding the sperm count, but not the sex in the office because it would not create a "creditable impression" on the jury. He acknowledged that after the petitioner told him different versions regarding the semen, he doubted whether the petitioner was telling the truth.

Mr. Bowman testified that he discussed character witnesses with the petitioner a lot. He said that he went over the pros and cons with the petitioner and told him that calling them "would probably be a bad mistake" and recommended against them. He said that the petitioner did not understand the limited nature of character witnesses. He noted that the state could ask the witnesses about the fraud charges and call other witnesses. He believed that, at best, character witnesses would be a "wash." He did not know if the petitioner agreed with his assessment, but he stated that the petitioner "certainly acquiesced" in his decision not to use them.

Mr. Bowman testified that the petitioner considered himself an expert in the area of pharmacology. Mr. Bowman said that he emphasized to the petitioner that the case was a rape case, not a case of drugs. He said that the petitioner never offered him an explanation for why Vistaril was in the victim's bloodstream, saying that he did not know. He noted that the petitioner failed to advise him that the petitioner had administered Vistaril to the victim in the past, a point on which the state cross-examined the petitioner at the trial.

Mr. Bowman testified that the petitioner wanted to be co-counsel because the trial court had admonished him at one time for speaking up. The petitioner believed that if he were co-counsel, the trial court could not put him in jail. Mr. Bowman told the petitioner that he was not willing to have the petitioner as co-counsel.

On cross-examination, Mr. Bowman acknowledged not introducing into evidence the photographs taken of the petitioner's examining room and examination table. He acknowledged that the petitioner asserted that it was impossible to have sex the way the victim claimed on the table and wanted him to bring the examination table into court. Mr. Bowman thought it would have been very damaging to introduce the table, and he was also concerned given the fact that the petitioner had told him that he had had sex with Christy Anderson on the examination table.

Mr. Bowman acknowledged that Dr. DeWitt was the only physician to examine the victim and that he was not called as a witness even though the petitioner asked him to do so. Mr. Bowman said he discussed the matter with the petitioner at counsel table. He said that Dr. DeWitt did not find any physical evidence, but would have testified that the victim was in a distraught state of mind and reported having undergone a terrible event. Mr. Bowman declined to call Dr. DeWitt.

Generally, Mr. Bowman did not think that the scientific issues about which the petitioner was concerned about witnesses not being called would have affected the outcome. He related this specifically to the drug testing that was done and the DNA evidence. In this respect, he did not think it was important to determine the victim's husband's DNA.

Mr. Bowman acknowledged that he did not call any of the other patients that the petitioner saw that day. He noted that the petitioner's office had trouble tracking them down, attributing the trouble to the length of time that transpired when the petitioner left the country.

Mr. Bowman testified that he did not think a change of venue should have been sought. He did not believe that the publicity regarding the petitioner's case justified a change. He said that the petitioner had been of the opinion that he had many friends and supporters in Washington County and that the trial should remain there.

Mr. Bowman acknowledged listening to the taped conversation that the petitioner had with the victim and her husband. He believed that he could understand what was being said. He said that he did not have the tape checked for authentication. He explained that he saw no need to check it because the petitioner never complained that the tape had false statements in it. He noted that the petitioner was, in fact, anxious that some parts of the tape be played because the petitioner denied the rape.

The petitioner called Dr. Michael Miyamoto, a professor of pharmacology at the Quillen College of Medicine. He said he saw nothing connecting benzodiazepines with sexual fantasies, although he said it could be possible. He denied knowing the effects of Vistaril or Depo-Medrol. He read from a PDR regarding the Depo-Medrol formulation being changed in November 1990 to be more "bioavailable" than previously. He explained that bioavailability relates to the drug's ability to combine with the appropriate receptors to produce the intended effect. He acknowledged that a drug that is not highly bioavailable can be injected but found in very small traces in the blood half an hour or an hour after absorption.

Lisa Michelle Stewart testified that she was a medical office assistant for the petitioner. She identified a letter that she wrote to Mr. Bowman and noted that the office records reflected that the victim had previously been hysterical and called the office many times threatening to kill herself if she could not talk to the petitioner immediately. She said that the victim had other personality problems, too. She described the victim as a problem patient. Ms. Stewart was subpoenaed to testify, but at that time, she had a five-day-old baby and her husband was having surgery that same day. She said that she did not recall being contacted by Mr. Bowman or his office about testifying the next day.

Ms. Penny R. Smith testified that she was the former wife of the petitioner and that her attorney was Rebecca Jones of Jones & Jones in Greeneville. After the petitioner left the country, her attorney had boxes of his mail, office records, and the like delivered to the law office. She recalled testifying at the trial and talking with Mr. Bowman. However, she did not believe that they discussed the substance of her testimony. Ms. Smith identified documents reflecting that she received $50,000 on the sale of the house and $700 per month for ten years for the sale of the petitioner's office building and stated that the petitioner left her with $50,000 in cashier's checks. She also acknowledged having a Toyota and a Jeep. However, Ms. Smith noted that the petitioner asked her for the checks, which she refused, about a month before he fled to Egypt and that the

finances were a mess after his flight. On cross-examination, Ms. Smith said that they had planned on starting a family. She said that she went off birth control pills in June and got pregnant some time in July. She said that the petitioner did the pregnancy test and would have known that she was pregnant by August.

Judge Brown accredited Mr. Bowman's testimony. He concluded that the tape of the petitioner's conversation with the victim was damaging and that counsel did "quite a good job" minimizing damage done when the petitioner testified. He concluded that the petitioner received excellent representation.

## POST-CONVICTION COURT'S FINDINGS AND CONCLUSIONS

After the hearing, the post-conviction court entered a Finding of Fact and Memorandum of Law that is sixty-two pages long and need not be reproduced here. It suffices, at this juncture, to state the court's summary findings:

> (1) The petitioner, Mohamed F. Ali, has failed to establish by clear and convincing evidence, T.C.A. § 40-30-210(f), that he is entitled to post-conviction relief upon an issue or combined issues presented.
>
> Although no longer the law, the court had also viewed the facts in light of the former preponderance rule and finds the petitioner had not shown that he would be entitled to relief under the former and now repealed preponderance test.
>
> (2) This court specifically finds that the actions of Judge Lynn W. Brown, beyond a reasonable doubt, did not and could not result in any prejudice to the petitioner and that the petitioner was not denied a fair judge at any stage of the proceedings.

The court accredited Judge Brown's testimony.

Relative to the claim of ineffective trial counsel, the court stated:

> This court declined to hear new proof or reopen the issue alleging that original trial counsel was ineffective on the basis that this issue had been directly raised as a ground in the motion for new trial where an evidentiary hearing was conducted by the original trial judge.
>
> . . . .
>
> This court, considering that the Tennessee Court of Criminal Appeals had specifically found the pro se petitioner's representation at the

-11-

motion for new trial hearing was proper, found that the issue was waived and previously determined by the trial court. In effect, the court declined a direct second bite of the apple. House v. State, 911 S.W.2d 705, 710 (Tenn. 1995).

Relative to the claim of ineffective appellate counsel, the post-conviction court noted that appellate counsel advised the petitioner not to include the ineffective assistance of trial counsel as an issue on appeal because it was best left for a future post-conviction proceeding. The court stated this was incorrect legal advice. However, the court also concluded that the decision not to appeal the ineffective counsel issue was a "reasonable tactical choice" based upon appellate counsel's view of the weakness of the issue. In this respect, the court also concluded that the petitioner was not prejudiced by the failure to pursue the issue in the original appeal.

## LAW GOVERNING JUDICIAL BIAS

The petitioner contends that the post-conviction court applied an incorrect standard in assessing whether judicial bias existed at the petitioner's convicting trial. He asserts that the court mistakenly applied harmless error analysis and, even then, disregarded the cumulative affect of existing errors. The state responds that the post-conviction court did not apply harmless error analysis, noting that the court found that no judicial bias existed.

The petitioner asserts that the law governing judicial bias emanates from State v. Benson, 973 S.W.2d 202 (Tenn. 1998), in which our supreme court vacated convictions because the judge had solicited a bribe from the defendant. The court held that the right to an impartial judge is basic to a fair trial and that a violation of the right affects the integrity of the judicial process and requires a new trial without a need for harmless error analysis. Id. at 207. It quoted from Vasquez v. Hillary, 474 U.S. 254, 263, 106 S. Ct. 617, 623 (1986), the following:

> "When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm. Accordingly, when the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from review, and we must presume that the process was impaired."

973 S.W.2d at 207. We note that the quote comes from a paragraph in which only a plurality of the court joined. See Vasquez, 474 U.S. at 255, 106 S. Ct. at 619. The petitioner also relies upon the Code of Judicial Conduct, which provides: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Tenn. S. Ct. R. 10, Canon 3, E(1).

The petitioner contends that Benson adopted the evidentiary standard and "2-prong" rule in Vasquez. He states that the evidentiary standard is "some basis." He states that the "2-prong" rule is "that, once the judge is discovered to have had 'SOME BASIS' for rendering a biased judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm."

First, we agree that the post-conviction court on occasion viewed events solely from a prejudice viewpoint. However, we believe the petitioner misapprehends many of the post-conviction court's rulings. In many of the examples the petitioner cites to us, the post-conviction court's actions reflect findings regarding both the lack of bias against the petitioner and the lack of harm to him. As previously noted, the post-conviction court ultimately stated:

> This court specifically finds that the actions of Judge Lynn W. Brown, beyond a reasonable doubt did not and could not result in any prejudice to the petitioner and that the petitioner was not denied a fair judge at any stage of the proceedings.

We interpret the post-conviction court's rulings to encompass two issues: (1) whether Judge Brown was biased against the petitioner and (2) whether Judge Brown's conduct was improperly prejudicial to the petitioner. In other words, the court considered the impact of Judge Brown's claimed misconduct even if it did not justify a finding of bias. We conclude that the post-conviction court did not erroneously apply a harmless error analysis to the ultimate issue of judicial bias.

As to the petitioner's claimed evidentiary standard of "some basis," we do not believe that our supreme court adopted such a standard or burden of proof when it quoted Vasquez. In Benson, the court concluded that the preponderance of the evidence showed that the trial judge had solicited the petitioner for a bribe and that the judicial corruption required reversal. 973 S.W.2d at 207. The preponderance of the evidence standard arose from the former post-conviction procedure act and the court noted that under the new act, a petitioner has the burden of proving factual allegations by clear and convincing evidence. Id.; see Tenn. Code Ann. § 40-30-210(f). The present case is governed by the new Post-Conviction Procedure Act. Thus, the petitioner was required to prove his allegations of fact by clear and convincing evidence, and we may overturn the trial court's findings only when the evidence in the record preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). We do agree, though, with the petitioner's assessment of the result once judicial bias is proven. Reversal is required without any separate consideration of whether proof of prejudice exists.

What constitutes the type of bias that is at issue in this case has been fully discussed by this court previously.

> While the words "bias" and "prejudice" are central to the determination of whether a recusal should be granted, neither term is defined in Tennessee case law as it relates to the issue of recusal. Generally the terms refer to a state of mind or attitude that works to

predispose a judge for or against a party. Other jurisdictions have elaborated on that decision.

A Missouri court has defined "prejudice" necessary to require recusal as
> [T]he attitude of personal enmity towards the party or in favor of the adverse party to the other's detriment. It is not the mere possession of views regarding the law or the conduct of a party or of his counsel. Prejudice is in the personal sense rather than in the judicial sense. Prejudice refers to a mental attitude or a disposition of the judge towards a party: either a hostile feeling or spirit of ill-will against one of the litigants, or a favoritism toward one of them.

State ex rel. Wesolich v. Goeke, 794 S.W.2d 692, 697 (Mo. App. 1990).

Not every bias, partiality, or prejudice merits recusal. To disqualify, prejudice must be of a personal character, directed at the litigant, "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." Id.

Personal bias involves an antagonism toward the moving party . . . but does not refer to any views that a judge may have regarding the subject matter at issue. Impersonal prejudice resulting from the judge's background experience does not warrant disqualification. If the bias is based upon actual observance of witnesses and evidence given during the trial, the judge's prejudice does not disqualify the judge. However, if the bias is so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial.

Adverse rulings by a trial court are not usually sufficient grounds to establish bias. Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification.

Often parties allege that comments made by the judge demonstrate bias or prejudice. An expression of opinion of the merits of the case prior to hearing the evidence is indicative of bias. Remarks which suggest that the judge has taken a position favorable or unfavorable to a party also indicate bias. Remarks indicating a judge's personal moral conviction or which "reflect prevailing

-14-

societal attitudes" are insufficient alone to mandate disqualification. United States v. Norton, 700 F.2d 1072, 1076 (6th Cir. 1983). Any comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case.

Alley v. State, 882 S.W.2d 810, 821-22 (Tenn. Crim. App. 1994) (most citations omitted). We will review the claim of bias with these guidelines in mind.

## JUDICIAL BIAS

The petitioner contends that the post-conviction court erred by finding that Judge Brown was not biased. He refers to various events that happened before, during, and after his trial, which he claims show Judge Brown's bias against him.

First, he refers to Judge Brown's comments during hearings on June 6, 1991, and October 4, 1991, that dealt with the bonding company on the petitioner's bond during the time that the petitioner had absconded to Egypt. Relative to an attempt to locate and return the petitioner for trial, Judge Brown commented about his hoping that the bonding agent had a "good used camel," because he was going to need it. The post-conviction court, referring to one of the hearings, found that:

> The camel comment was not a racial slur nor evidence of bias of the judge toward the petitioner and even if by some leap of the imagination it could be considered as such it would be harmless error beyond a reasonable doubt and no possible prejudice could fall on the petitioner as a result of the comment.
>
> The comment seems to be at best a side remark clearly aimed at the bail bondsman pointing out the difficulty he might have in returning a very elusive fugitive defendant from Egypt [probably an attempt at ironical humor].

Also, although his brief does not specify how the remarks show bias, the post-conviction court stated that the petitioner claimed that the comment amounted to a racial slur and was insensitive to the petitioner. We assume that the petitioner's concerns remain the same, although he does not explain why he believed the comment to be a racial slur and insensitive to him. The petitioner complains that the court considered only one of the remarks. Given the fact of the petitioner's whereabouts at the time of the hearings, the fact that Egypt is largely desert terrain, and the fact that camels have been used for countless centuries as beasts of burden and conveyance in desert regions of Africa and the Middle East, we agree with the post-conviction court's view of the comments. Obviously, the context of both comments was the same, and although the post-

-15-

conviction court mentioned only one of the hearings, its findings apply equally well to the second hearing.

Second, the petitioner refers to Judge Brown prohibiting him at his motion for new trial hearing from making an offer of proof through witnesses of the manner by which the petitioner's passport was released to private individuals who, he claims, unlawfully posed as FBI agents in Egypt. The petitioner claimed that he wanted to show that the police were not authorized to release the passport and that the methods used to return him for trial violated his Fourth Amendment rights. The record reflects that Judge Brown viewed the petitioner's claim as irrelevant to the issue of whether or not the petitioner was entitled to a new trial. Also, Judge Brown noted that the petitioner testified that he returned from Egypt voluntarily. He indicated that the fact that "bounty hunters put some pressure" on the petitioner was irrelevant.

The petitioner complains that Judge Brown's refusal to allow him to present proof reflects that Judge Brown "targeted" the petitioner. We note that the post-conviction court wrongly found that this issue was waived because it was not in the motion for new trial. However, we agree with the court's conclusion that the remedies arguably resulting from the petitioner's claim would not result in his obtaining a new trial.

Third, the petitioner refers to impeachment of the victim at trial. His brief states that the court allowed impeachment "but excluded similar others intended to show bias and proof of habit. Bias was shown when Brown stated that the only perjured testimony he heard was Ali's . . . when the alleged victim's perjury had been noted" by Judge Brown. The petitioner's brief does not specify what was allowed and what was excluded. The record of the convicting trial reflects that the victim was describing the sensation that she felt from the medication that the petitioner had given her before the rape. Mr. Bowman then queried, "Was it the same sensation that you had after you had taken LSD or marijuana in your life?" The victim responded that she had never taken LSD or marijuana in her life. At first, Judge Brown sustained the state's objection. The record reflects that documents reportedly from Watauga Mental Health Services included an intake sheet dated five days after the rape obtaining information regarding the victim. One of the sheets contained notes reflecting that the victim had used LSD in 1986 and used marijuana two to three times in 1986. The prosecution had turned the records over to the defense. Initially, Judge Brown believed that its prejudicial effect outweighed any probative value of the evidence. However, the next morning he considered the matter further. In a jury out hearing, the victim again denied any use of LSD or marijuana. When shown the mental health center documents, she denied telling anyone that she had used LSD and marijuana in 1986 and denied that she had written those notations. She said that the information was inaccurate. Judge Brown then concluded that the defense could question the victim regarding prior use of LSD and marijuana. In front of the jury, Mr. Bowman asked the victim if she ever told representatives of the Watauga Mental Health Center that she in fact had used LSD and marijuana. She replied that she did not.

We fail to see how any actions by Judge Brown regarding this issue indicate bias against the petitioner. To the contrary, the record reflects that he used considered judgment and ruled in favor of the petitioner.

At the motion for new trial hearing, Judge Brown was delivering his findings when the petitioner inquired about findings regarding the victim's "perjured testimony." Judge Brown responded, "The Court is of the opinion that if there was any perjured testimony in this case it was yours, Mr. Ali." He also explained that the victim had not signed the documents and he did not find it to be perjury. We view Judge Brown's comment to be gratuitous relative to the issue regarding the victim's testimony. However, Judge Brown presided over the trial and observed all the witnesses and evidence given during the trial. Judge Brown's comment reflects a conclusion drawn from those observations. He was allowed to do so. See Alley, 882 S.W.2d at 821.

Fourth, the petitioner refers to the ex parte contact Judge Brown had with Rev. Strother noting that two weeks before his sentencing hearing, Judge Brown said, "Don, you are not going to like what I am going to do in Dr. Ali's case." The petitioner's brief regarding this issue complains about the findings of the post-conviction court and questions the validity of Judge Brown's original insistence that Rev. Strother had visited him in the office as opposed to having a telephone conversation. The brief does not otherwise specify how Judge Brown's comment shows him to be biased against the petitioner.

The record reflects that Rev. Strother contacted Judge Brown in ex parte fashion about the petitioner's sentencing. He indicated that he believed there was lack of evidence and that Judge Brown should give the petitioner a light sentence. Judge Brown acknowledged telling Rev. Strother that he would not like what Judge Brown was going to do about the petitioner. However, he denied having his mind made up about sentencing at that time and indicated that his statement was partly in response to Rev. Strother's claim of the petitioner's innocence. The post-conviction court accredited Judge Brown's testimony regarding these facts. We do not believe the record preponderates against such findings.

Fifth, the petitioner refers to Judge Brown's purported ex parte contact with Sheriff England for the purpose of having the petitioner sent to the state penitentiary. The petitioner asserts that the timing was critical because it was before the hearing on his motion for new trial and he was proceeding without an attorney. He notes, as well, that Judge Brown then changed the hearing date to over two weeks later, which the petitioner asserts allowed certain witnesses to become "unavailable" on the new date. The petitioner's brief does not specify the missing witnesses or their expected testimony.

The record reflects that Judge Brown denied contacting Sheriff England about the petitioner. Mr. England testified that Judge Brown had told him to send the petitioner the next time there was an opening. Mr. England acknowledged that he had previously been holding the petitioner locally at the request of Rev. Strother. The post-conviction court found nothing wrong with Judge Brown's actions and pointedly criticized Mr. England for complying with Rev. Strother's request.

-17-

The petitioner contends that Judge Brown's actions reflect bias because he targeted the petitioner with them. He notes that Judge Brown did not tell the former sheriff to "ship off sentenced prisoners." On the other hand, we note that the evidence does not reflect whether any other prisoners were being intentionally detained by the former sheriff and whether Judge Brown knew about them. The post-conviction court found that Judge Brown's actions did not show bias. We do not believe that the evidence preponderates otherwise.

Sixth, the petitioner refers to Court of the Judiciary findings. He asserts that Judge Brown violated confidentiality rules regarding the court's investigation of the petitioner's complaints and that Judge Brown "used foul language and insulted" the petitioner. At the post-conviction hearing, Judge Brown acknowledged that the Court of the Judiciary deemed the lunch with Dr. DeWitt and the ex parte conversation with Rev. Strother to be inappropriate. The record reflects that Judge Brown held a hearing regarding bond pending appeal while the petitioner's case was on appeal. When the petitioner's counsel referred to the complaint filed with the Court of the Judiciary, Judge Brown stated, "I have never seen so much garbage, untruth, lies and deceitfulness. And the Court of the Judiciary determined that that was about the substance of it, it's been dismissed."

The post-conviction court viewed the Court of the Judiciary findings to be irrelevant to the issue of judicial bias. We agree. Moreover, the petitioner does not specify what confidentiality rule Judge Brown violated in discussing with the petitioner's attorneys complaints that the petitioner had made to the Court of the Judiciary. We do note that the petitioner's conviction and sentencing, which were ultimately sustained, had occurred at the time of the bond hearing. In other words, Judge Brown's view of the petitioner's allegations in the complaint has no probative value as to Judge Brown's views of the petitioner in earlier proceedings.

Seventh, the petitioner refers to the fact that Judge Brown ate lunch with a witness who testified at the motion for new trial hearing and failed to disclose his relationship with the witness. This claim relates to the fact that Judge Brown ate lunch with Dr. Jan Allen DeWitt, who testified at the new trial hearing. Judge Brown acknowledged that he was an acquaintance of Dr. DeWitt and acknowledged eating lunch with him on the day Dr. DeWitt testified. Judge Brown said that he and his court reporter went to lunch and that when Dr. DeWitt arrived, he invited him to join them because no other seats were available. Judge Brown saw no reason to disclose the fact that Dr. DeWitt was a personal acquaintance. The post-conviction court found that the proof did not show "any act by [Judge] Brown that would detract from the conclusion that the petitioner suffered no harm to his case or that the trial judge was biased against him." We agree that the petitioner has not shown how this relates to purported bias. Dr. DeWitt's testimony was straightforward regarding his examination of the rape victim. The record reflects that the petitioner made several complaints to the Court of the Judiciary regarding Judge Brown. Apparently, the court in one of the cases responded that it was inappropriate for Judge Brown to be eating lunch with a witness who was testifying in the matter before the judge. However, we see nothing that would relate Judge Brown's actions to bias against the petitioner.

Eighth, the petitioner referred to Judge Brown's advising prison guards in 1998 that the petitioner remained a security threat and should not have his restraints removed. Unfortunately, the petitioner's brief fails to relate this to any measure of bias. We fail to see any specific relevance of these circumstances to the petitioner's convictions and sentences.

Ninth, the petitioner asserts that Judge Brown made improper comments during the motion for new trial hearing. He notes that Judge Brown told an assistant district attorney, "I know we're wasting time General, but let's–I'm giving–him more latitude," and "I'm letting him build a record." This occurred while the petitioner was examining a witness. The petitioner's brief asks, "Who were WE/US?" The state argues that Judge Brown's statements are nothing more than an explanation to an objecting prosecutor regarding the broad latitude given a pro se defendant. It also argues that the use of the pronoun "we" was obviously a reference to the collective individuals in the courtroom. We agree with the state's view of this matter.

Tenth, the petitioner refers to an assistant district attorney general filing a motion to quash a subpoena on behalf of Judge Brown. The petitioner claims that such was inappropriate and a conflict of interest. However, as the state notes, the motion to quash was filed in the post-conviction proceeding before another judge. It is irrelevant to whether Judge Brown was biased against the petitioner during the proceedings dealing with his conviction and sentencing.

The petitioner claims that various events and conduct by Judge Brown prove bias. Overall, the petitioner presents (1) two pretrial hearings dealing with the petitioner's fugitive status, (2) a mid-trial ruling relative to impeachment of the victim, (3) Judge Brown's presentence conversation with Rev. Strother, (4) Judge Brown's order before the motion for new trial hearing that the petitioner be sent to the penitentiary, (5) Judge Brown's refusal to allow the petitioner to provide evidence at the motion for new trial hearing regarding the petitioner's passport and how he was returned to the United States, (6) Judge Brown's comments to the prosecutors during the motion for new trial hearing relative to wasting time, (7) Judge Brown's comment at the motion for new trial hearing that the only perjury he had heard was the petitioner's, (8) Judge Brown's eating lunch with Dr. DeWitt during the motion for new trial hearing, (9) Judge Brown's comments regarding the Court of the Judiciary complaints that were filed after the petitioner's case was on appeal, (10) Judge Brown's comments to prison guards in 1998, and (11) the motion to quash filed on behalf of Judge Brown by an assistant district attorney general during the post-conviction proceedings. Looking at the facts, severally and collectively, regarding the various events upon which the petitioner relies, giving credit to most of the basic findings made by the post-conviction court, we fail to see how any rational mind could conclude to any reasonable degree that Judge Brown was personally biased against the petitioner during the trial court proceedings in the petitioner's rape and attempted bribery case.

## EXCLUSION OF EVIDENCE

The petitioner complains about the post-conviction court's excluding evidence at the hearing. He contends that the evidence was admissible because it was relevant to the issue of judicial bias. Some of the complaints are specific while others are not.

The petitioner complains that the post-conviction court prohibited him from questioning Judge Brown regarding the "refusal" to grant the petitioner pretrial jail credits. While reviewing the petitioner's list of disciplinary complaints at the post-conviction hearing, Judge Brown noted the one about this claim and stated that he did not recall pretrial jail credits ever arising as an issue. When the petitioner's counsel was verifying if Judge Brown did not recall, the post-conviction court sustained the state's objection. The court stated that because the petitioner had ultimately received his jail credits, he was not prejudiced.

The record reflects that the judgment forms for the petitioner's convictions, filed in December 1993, were completely filled out except for the pretrial jail credits. Although the petitioner testified about the length of his detention at the sentencing hearing, we see no indication in the record that the petitioner raised the issue of the judgments being incomplete after the date they were filed. That is, no mention was made at the motion for new trial hearing or on appeal.

The petitioner claims that Judge Brown left his pretrial jail credits off and then ignored the petitioner's subsequent motion to obtain the credits. He argues that the fact that he ultimately received the credits is beside the point. Rather, he argues, Judge Brown's nonaction is relevant to the petitioner's claim that Judge Brown was biased against him.

We agree with the petitioner. The post-conviction court erred in not allowing him to question Judge Brown about the failure to act regarding the pretrial credits. However, in context, we do not believe that the error more probably than not affected the result. T.R.A.P. 36(b). As previously noted, in reviewing the record, including the many instances that the petitioner has claimed show bias, we have concluded that the existing evidence does not reflect personal, improper bias by Judge Brown against the petitioner. We also note that the post-conviction court found that the petitioner was not denied a fair judge at any stage of the proceedings. Nothing even hints at such a bias through the motion for new trial hearing. Judge Brown said that he did not recall pretrial credits being an issue. We cannot fathom how further questioning would have made any difference in the ultimate findings and conclusions reached by the post-conviction court.

The petitioner complains that the trial court refused to allow proof regarding Judge Brown's relationship with Danny Pike. He states that Mr. Pike testified at the motion for new trial hearing and knew Judge Brown personally. He states that Judge Brown was "judicially" involved in Mr. Pike's multiple indictments, pretrial diversions, and probation revocations. The petitioner asserts that Judge Brown failed to disclose his personal and judicial relationship with Mr. Pike.

The record reflects that Mr. Pike was called by the petitioner to testify at the motion for new trial hearing relative to the state not providing exculpatory information. Mr. Pike had been employed by the Johnson City Police Department and had accompanied Sergeant Sam Reed in the July 1989 search of the petitioner's office. He testified about the items found by him and Sergeant Reed. He acknowledged being indicted in 1992 for forging narcotic prescriptions and being placed on pretrial diversion. Mr. Pike denied abusing narcotics in July 1989 and denied having a narcotics problem or forging narcotic prescriptions. Judge Brown concluded that Mr. Pike revealed no exculpatory information for the petitioner. We note that Mr. Pike did not testify at the petitioner's trial.

The post-conviction court concluded that because Mr. Pike did not testify at the trial, proof regarding him and Judge Brown was unnecessary. Again, we agree with the petitioner that the post-conviction court missed the petitioner's point. The fact that Mr. Pike did not testify at the petitioner's trial had little relevance to whether or not Judge Brown's relationship with him was a matter of concern at the motion for new trial hearing. Thus, the post-conviction court erred. However, in context, we do not believe that the error more probably than not affected the result. T.R.A.P. 36(b). First, we do not believe that the witness's being a former police department employee and a former defendant appearing before Judge Brown gave rise to a duty on Judge Brown to disclose any relationship. Second, we note that the fact that Mr. Pike was a nominal witness and answered all of the petitioner's questions provides no hint of judicial bias in the process.

Next, the petitioner complains about the trial court's failure to comply with the July 18, 1994 order of this court remanding the issue of the petitioner's indigency to the trial court for hearing. His argument is the following:

> An excluded "act from the bench". Brown refused to comply
> with this Court's Order dated 7/18/94 (R, I at 112-118, 127-28). Ali
> wanted to discover Brown's habit or routine practice and whether he
> treated similarly-situated defendants alike. The cumulative-effect..
> [sic]

The petitioner's references are only to the orders filed by this court and his own pleadings. There is no evidence of what transpired in the trial court after this court's July 18 order. In fact, there is no reference to anything occurring at the post-conviction hearing relative to this matter. The petitioner has shown no basis for relief.

Next, the petitioner refers to an "untrue affidavit and motion to quash in 1997." He states:

> Details and exhibits are explained in the record (R, I at 20, 110-11,
> 128-29). Connection to Ali is obvious. This act was neither "from
> the bench" nor after Brown "lost control of case", but the court
> ignored it in the Order. The cumulative-effect..[sic]

-21-

The record references are to the petitioner's post-conviction petition, an exhibit to his amended petition, and his memorandum in support of his post-conviction claim of bias. The exhibit reflects that the motion to quash a subpoena for Judge Brown was filed in a civil case the petitioner had filed against the victim and others. The petitioner makes no reference to the hearing transcript relative to proof or the post-conviction court's rejection of these matters. The petitioner has shown no basis for relief.

Next, the petitioner refers to "ex parte contact with Alfa Bridger." He asserts:

> Details, exhibits and connections to Ali are explained in record (R, I at 20, 101-02, 129). After Brown testified, his credibility was at issue and Ali was entitled to question him about any relationship that he has had in the past, a friendship, association or otherwise, to show bias, prejudice or interest (Exhibit 10, I at 91). Ali wanted to reveal that Brown discussed his case with his friend ex parte. The cumulative-effect..[sic]

Again, the references are to pleadings, exhibits, and a memorandum filed by the petitioner. The only reference to the record relates to Judge Brown allowing the state at the motion for new trial hearing to cross-examine a witness called by the petitioner about her intimate relationship with the petitioner. Judge Brown viewed it to be relevant to her credibility in testifying for the petitioner. At another point, the petitioner sought to ask Judge Brown about a relationship with another woman, not a witness, and the post-conviction court prohibited it as irrelevant to the inquiry. The petitioner has failed to see the difference between the two events. The relationship of a party and a witness who testifies for that party is relevant to the witness's credibility, the concern obviously being whether the witness would knowingly or unknowingly slant testimony in favor of the party to be helpful. However, when the party is testifying and is asked about a relationship with a nonwitness, the relationship to the party's credibility is not apparent. In the present case, the petitioner has not provided anything other than general claims regarding what he expected to prove by such a line of questioning. A trial court need not admit tangential evidence or allow fishing expeditions. In this respect, the determination of relevancy is within the discretion of the trial court and will not be overturned absent an abuse of discretion. State v. Williamson, 919 S.W.2d 69, 78-79 (Tenn. Crim. App. 1995).

Next, the petitioner complains about the post-conviction court not allowing proof of Judge Brown's signing a blank order of dismissal in 1998 in one of the petitioner's habeas corpus cases. His brief presents the following argument:

> Ali did not seek to "re-try a habeas corpus" in post-conviction context, contrary to the court finding (T, I at 97, 101, 113). Error was corrected after Ali was forced to file multitudes of pleadings (R, I at 103-04, 126-30). He wanted to show that Brown targeted him with the act. Was it his habit or routine practice to sign blank orders

dismissing <u>similarly-situated</u> writs?  If he answered "YES", he was grossly negligent and if he answered "NO", he targeted Ali.  The court did not allow Ali's questions after Brown was cross-examined (T, I at 98: lines 1-3) and even after <u>the State</u> asked him about difference "acts from the bench" to show <u>non-bias</u> (T, II at 165).  The cumulative-effect..[sic]

The record reflects that in November 1998, Judge Brown entered an order in one of the petitioner's habeas corpus cases that did not contain a case number.  The petitioner refers to a letter from Judge Brown to the presiding judge of the district that explains that the judgment related to a case that had been appealed and remanded for execution of judgment but that the clerk's office filled in the wrong case number, thereby dismissing another pending habeas corpus case by the petitioner.  The post-conviction court ruled that evidence regarding the order would not be allowed because it related to events well after Judge Brown had any dealings with the petitioner's criminal case.

The petitioner contends that the post-conviction court was mistakenly relying on the fact that the habeas corpus action was a collateral matter because of its mistaken belief that prejudice was the issue.  As before, the petitioner asserts that the evidence would be relevant to proving that Judge Brown was biased against him during the times at issue.  We agree with the petitioner that the post-conviction court misunderstood the purpose of the evidence.  However, we believe that any evidence presented regarding that time would be of nominal probative value regarding Judge Brown in 1993 and 1994.  We believe that any error was harmless.

Next, the petitioner complains about the post-conviction court excluding evidence regarding Judge Brown's writing the Board of Paroles against the petitioner being paroled.  The petitioner asserts that the letter contained "untrue facts."  He notes that the letter stated that he entered guilty pleas to Medicaid fraud charges when he actually entered a nolo contendere plea to theft under $500.  He states that Judge Brown said that the petitioner's lawsuit against the victim had been "dismissed as frivolous," when it had been voluntarily nonsuited at the time.  The petitioner asserts that he wanted to question Judge Brown about his opinions in the letter which were inconsistent with facts personally known to Judge Brown.  As in the trial court, he posits that the letter resulted from Judge Brown's anger about the petitioner's lawsuit that had been served upon him just days earlier.  Again, the post-conviction court refused to allow the questioning of Judge Brown regarding the letter or to allow a subpoena for "similar letters against <u>similarly-situated</u> parolees of different race or religion."  He boldly asserts, "Brown's letter showed bias in 1999 and supported earlier bias in 1993 and 1994.  The cumulative-effect.. [sic]"  We do not quarrel with the post-conviction court's decision not to allow evidence regarding the letter.  In fact, the petitioner's argument regarding the letter resulting from Judge Brown's anger about the petitioner's lawsuit warrants an inference that the letter has no probative value regarding whether or not Judge Brown was biased in 1993 or 1994.  There is no merit to this claim.

Last, the petitioner refers to an "ex parte boat trip in 1999" and states the following:

Details, exhibits and connection to Ali are explained in record (R, I at 20-21, 100, 130). After Brown testified, his credibility was at issue and Ali was entitled to question him about any relationship that he has had in the past, a friendship, association or otherwise, to show bias, prejudice or interest (Evid. R. 616; Please See Exhibit 10, I at 91).

Under the totality of circumstances, a question such as "Judge Brown: Did you discuss <u>Ali's</u> on your boat <u>that day</u>?" would have been relevant. The cumulative-effect..[sic]

The references are to the petitioner's pleadings and an exhibit of an internal memorandum from the Correctional Counseling Institute's director to its executive director. Generally, the circumstances relate to a March 1999 social gathering with Judge Brown and his wife and the director and an employee of his on Judge Brown's boat. We can glean no relevance to the issues in this case. The petitioner provides no authority that he can take his own legal fishing trip to ask questions regarding anyone that Judge Brown happens to meet. As previously noted, the post-conviction court had the discretion to determine the admissibility of evidence and its relevance to the case. There is no merit to this claim.

## DISCOVERY REQUESTS

The petitioner contends that the post-conviction court improperly refused to allow discovery relating to certain matters involving Judge Brown's testimony. He refers to a letter that the post-conviction court sent to Judge Brown on January 19, 2001, in which the court noted that Judge Brown told the court's legal assistant that he had reviewed his calendars or journals to allay any concerns he had regarding his testimony about facts or events that occurred eight years earlier. The court advised Judge Brown to notify the court and counsel if something developed from his review.

Partly in response to the letter, the petitioner filed a motion seeking a rehearing, a new trial, and, alternatively, a reconsideration. Among other things, the motion sought complete discovery regarding Judge Brown's comments to the post-conviction court's legal assistant. The inference made by the petitioner was that Judge Brown had apparently viewed some of his testimony to be in error. The court denied the motion without allowing further testimony from Judge Brown. It assumed for argument sake that Judge Brown was acknowledging that his conversation with Rev. Strother was by telephone, not in person as he had previously described. The court concluded that the change would not alter its view of Judge Brown's credibility or its findings. We note that a second order of denial entered by the post-conviction court reflects that the petitioner filed a second motion to reconsider.

The petitioner contends that he was entitled to question Judge Brown under oath in order to assess the changes, if any, in Judge Brown's recollections that would bear on his credibility or the bias claim. He asserts that even though Judge Brown did not offer any new information, the

petitioner and the post-conviction court should be allowed to make their own assessment of such information by means of a hearing. The state responds that the court lost jurisdiction of the case, so the petitioner was not entitled to a hearing or discovery. We agree with the state.

The post-conviction court entered its judgment denying the petitioner relief on January 7, 2001. It issued the letter to Judge Brown, with copies to counsel, on January 19, 2001. The petitioner filed his notice of appeal and motion for a transcript of the proceedings for appeal purposes January 22, 2001. The petitioner's first motion for relief from the post-conviction court's judgment was filed on February 16, 2001.

Unless otherwise provided by a statute or rule, a trial court's jurisdiction over a case ends upon the filing of a notice of appeal. See State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996). The filing of the notice of appeal vests jurisdiction in the appellate court. Any filing in the trial court and any action by that court after the notice of appeal is filed are effectively nullities. In the present case, the post-conviction court had no jurisdiction to order the discovery requested by the petitioner. Thus, there is no merit to this issue.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Most of the petitioner's complaints and assertions relate to his trial attorney, Mr. Bowman. He also asserts that he has overcome the presumption of waiver so as to allow him to pursue his claim of ineffective assistance of his trial counsel. He relies upon matters he claims were discovered after his motion for new trial hearing, such as, the affidavit of Dana Rogers in which Mr. Rogers stated that he was a former boyfriend of the victim and that the victim made numerous false criminal charges against him. Rev. Strother testified that he obtained the affidavit and relayed it to Mr. Bowman in 1995.

First, we believe that the petitioner misapprehends the status of his claim against trial counsel. The petitioner raised and litigated this claim at the motion for new trial hearing. He did so at his peril. The fact that he had not discovered certain circumstances regarding counsel does not negate the fact that he had taken the opportunity to present his claim at that time.

> A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Tenn. Code Ann. § 40-30-206(h). Moreover, this court has concluded that allegations of additional facts to support a claim for relief may not overcome the fact that the claim has been previously determined. See Cone v. State, 927 S.W.2d 579, 582 (Tenn. Crim. App. 1995). In this respect, the petitioner has neither alleged nor shown that his failure to discover the new information resulted

-25-

from improper state conduct or other such conduct that might raise a due process issue which might overcome the rule of previous determination. See, e.g., Sample v. State, 82 S.W.3d 267 (Tenn. 2002). Thus, with the petitioner acting as his own counsel at the new trial motion hearing, any failure to present all factual bases for his claim against trial counsel falls at his feet. The post-conviction court properly limited the petitioner's claim to the issue of the ineffective assistance of appellate counsel with the record for review being limited to the original trial and the hearing on the motion for a new trial.

At this point, we note that the petitioner repeatedly refers to "cross-over" effect from Judge Brown's actions – which he claims were biased – to the issue of ineffective assistance of trial counsel. We need not revisit the petitioner's claims against Judge Brown. Suffice it to say that our conclusion that the trial court properly found that Judge Brown was not biased forecloses this avenue of the petitioner's attack.

Due process of law requires that a criminal defendant be entitled to the effective assistance of counsel on appeal. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995); Evitts v. Lucey, 469 U.S. 387, 105 S. Ct. 830 (1985). The test by which we consider the effectiveness of appellate counsel is the same as that for trial counsel. Under the Sixth Amendment, when a claim of ineffective assistance of trial counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9.

Relative to appellate counsel, the petitioner contends that counsel incorrectly advised him regarding not raising on appeal the issue of the ineffective assistance of trial counsel and improperly failed to raise the issue on appeal. Unquestionably, the circumstances of this case reflect that appellate counsel was legally incorrect in telling the petitioner that the ineffective counsel issue could be raised in a subsequent post-conviction case and should not be raised in the appeal of the conviction. We acknowledge that appellate counsel was attempting to follow this court's previous admonishments about raising the issue of trial counsel's effectiveness in the direct appeal, warning that such a practice is "fraught with peril." See, e.g., State v. Anderson, 835 S.W.2d 600, 606 (Tenn. Crim. App. 1992); State v. Jimmy L. Sluder, No. 1236, Knox County (Tenn. Crim. App. Mar. 14, 1990) (refusing to decide the issue and stating that it could be raised later in a post-conviction action). However, once the petitioner raised the issue in his motion for new trial and developed

extensive proof, counsel should have recognized that the failure to appeal this litigated issue would leave the matter as a previously determined issue.

In any event, we conclude that the petitioner has not shown that his convictions, sentences, or lost appeals resulted from the ineffective assistance of counsel. First, we note that the petitioner's brief on this issue provides little detail, little explanation of the facts supporting his assertions, and little reasoning. He starts with "examples" that he says show the "cross-over effect of judicial bias." The examples relate to Judge Brown's (1) hindering the petitioner's ability to develop a "fruit of the poisonous tree" claim, (2) having the petitioner sent to the DOC and changing the new trial motion hearing date, thereby causing loss of witnesses, (3) hindering the petitioner's development of his "Mystery Witness/Campbell/Caldwell/Henderson" claim, and (4) hindering the petitioner's ability to preserve a claim regarding grand jury tampering. Unfortunately, the petitioner does not explain either the facts behind each claim or how any facts or law would provide him relief from his convictions or sentences.

He then presents an "example" showing that the preponderance of the evidence is against the trial court's findings. He notes that he claimed counsel should have investigated DNA evidence reflecting that sperm found in the petitioner's examining room belonged to the petitioner. The petitioner's ex-wife had testified that they knew she was pregnant "by August." The petitioner correctly notes that the rape charge was in July but that the trial court incorrectly concluded that the rape was August. Based upon this mistake, the trial court stated that if the petitioner had testified that the sperm could have existed because of sperm count tests for pregnancy purposes, "the defense case would have self-destructed." Needless to say, the trial court's reliance upon the rape occurring in August was in error. However, the petitioner does not explain how this error renders the trial court's conclusion that the petitioner received effective assistance to be error. Moreover, the petitioner provides no other examples, only asserting that the "evidence and record preponderates against the majority of lower court's findings against Ali."

Finally, the petitioner asserts the following regarding appellate counsel:

> Appellate counsel rendered deficient performance, and prejudiced Ali again, in 1995 by giving him wrong advice on waiver of Ineffective Counsel issue and by failing to raise other issues which had reasonable probability of success. "Fruit of the Poisonous Tree", "Mystery Witness" and "Grand Jury Tampering" claims were ripe for review "as is" (as developed pro se). EXAMPLE: the lower court found *FACTUAL MERIT* in "Fruit of the Poisonous Tree" claim (R, II @ 226 & n. 3, 269). Ali cited *McLaughlin*, 500 U.S. 44 and *Wong Sun*, 371 U.S. 471 in his Amended Motion or [sic] A New Trial dated 2/4/94 (Exhibit 18, II @ 6-7), thus, this claim had *LEGAL MERIT* as well; *Huddleston*, 924 S.W.2d 666.

The lower court denied relief mainly due to the imperfect quality of Motion for a New Trial pro se record, which was caused by the cross-over effect of judicial bias and errors.

The evidence in record preponderates against the majority of lower court's findings against Ali.

The cumulative-effect of all factors and errors should tip the scale in Ali's favor under the second prong of *Strickland*.

The conclusory and limited arguments in the petitioner's brief are insufficient to justify relief. If the petitioner provides only "examples," it is not our job to rummage through the record to find other "examples." As to the examples given, the petitioner does not specify and we have not found any prejudice related to them.

The "Fruit of the Poisonous Tree" claim relates to the fact that the petitioner's passport was apparently given to private citizens by law enforcement for the purpose of aiding in pursuing and returning the petitioner who had fled to Egypt. The "Mystery Witness" claim is related to the "Poisonous Tree" claim in that it is based upon the state's witness, Paul Caldwell, who went to Egypt and induced the petitioner's return to the United States.

The convicting trial transcript reflects that Mr. Caldwell contracted with the petitioner's bonding company, as a bounty hunter, to locate and retrieve the petitioner from Egypt. Mr. Caldwell acknowledged using an alias of Bob Henderson and having other associates using aliases. He stated that he located the petitioner and talked with him about returning. He said the petitioner refused to leave Egypt and offered him various sums of money to leave him alone. Ultimately, Mr. Caldwell got the petitioner to return to the United States by using "psychological measures."

At the new trial motion hearing, the petitioner complained that Mr. Caldwell was a surprise witness who had not previously been disclosed to the defense. The petitioner asserted that the state sought a continuance to obtain the presence of "Paul Campbell" but that Paul Caldwell was the witness called. The state noted that the defense neither objected to the witness testifying nor sought a delay to allow further defense preparation. Thus, any objection at the time of the motion for new trial was waived.

Unfortunately, the petitioner does not specify in his brief the issue to which Mr. Caldwell relates. If he is still complaining about Mr. Caldwell being a surprise witness and the failure of his counsel to object to him, he has not provided what, if anything, has been uncovered that would have a reasonable probability of changing the result in his trial. In other words, he has not shown any improper prejudice because of Mr. Caldwell's testimony.

Perhaps the petitioner's complaint regarding Mr. Caldwell relates to the "poisonous tree" claim. In another part of his brief, the petitioner claims that his passport was improperly released

to private citizens who took it overseas and lied about being FBI agents. As previously discussed, in complaining about Judge Brown not allowing the petitioner to call witnesses at the new trial motion hearing, the petitioner's brief asks if the bounty hunters acted in concert with state agents, what was the chain of custody of the passport, and when was he brought before a magistrate for arraignment after a warrantless arrest. He raises these concerns in the context of violation of his Fourth Amendment rights and invokes the fruit of the poisonous tree doctrine by which items and statements derived from an illegal search or seizure may not be used as evidence.

Unfortunately, though, the petitioner does not specify what items or statements are subject to suppression. In any event, we see no merit to the petitioner's claim. Even if the bounty hunters were acting on behalf of the State of Tennessee, the petitioner admitted that he returned voluntarily. Thus, no seizure occurred in Egypt. As importantly for trial purposes, the fact that he may have been "duped" regarding the bounty hunters' authority does not bar his prosecution in Tennessee. See, e.g., State v. James Blanton, No. 01C01-9307-CC-00218, Cheatham County, slip op. 32-37 (Tenn. Crim. App. Apr. 30, 1996) (holding that "illegal" kidnapping of defendant in Mexico by FBI agents and return to the United States did not bar the defendant's trial and conviction), aff'd, 975 S.W.2d 269, 285 (Tenn. 1998) (expressly affirming the issues decided in the Court of Criminal Appeals).

Relative to his claim of being held forty-eight hours without an arraignment, it appears that he is referring to the circumstances surrounding his return from Egypt. In this respect, we note that the petitioner was already indicted and that a capias had issued for his arrest once his fugitive status had been learned. Obviously, his arrest or detention cannot be considered "warrantless."

Relative to his "Grand Jury Tampering" claim, the petitioner relies upon his trial attorney's affidavit filed at the new trial motion hearing which states the following:

> On Thursday, February 1, 1990, I began receiving information concerning the allegations contained in the foregoing motion. I received additional information on Wednesday, February 7, 1990. Neither I, anyone in my employ, nor the defendant, have had any contact with any grand juror, nor to my knowledge did anyone above-named solicit any other person for this information. Nevertheless, based upon information and belief, I state the foregoing [sic]. Investigator Sam Reed appeared as the only Grand Jury witness in this cause. One grand juror excused himself from voting in this case. Thereafter, following the testimony, the Grand Jury voted a "no true" bill, the vote being eleven for and one against. Thereafter the witness was allowed to return to the Grand Jury room, not for the purpose of giving testimony but for the purpose of influencing the recalcitrant grand juror into changing his or her vote. After two subsequent votes, said grand juror did in fact change her vote. Additionally, upon information and belief, I state that the witness falsely testified to the Grand Jury that the defendant had "confessed" to the crimes in the

indictment. The state has provided all statements of the defendant to counsel and I am aware of no statement by the defendant that can be characterized as a confession. I am further advised that when requested by a grand juror to produce said statements, the witness declined to do so.

At the new trial motion hearing, Judge Brown viewed Mr. Bowman's affidavit as bearing on the petitioner's claim of newly discovered evidence. He noted that a motion to dismiss the indictment had not been filed before trial and deemed the issue waived. See Tenn. R. Crim. P. 12(b)(2). The petitioner sought to call witnesses, apparently including a grand juror, but Judge Brown deemed them unnecessary given his ruling. The petitioner did not testify or question Mr. Bowman about the circumstances surrounding this issue as it would relate to the ineffective assistance of counsel.

We perceive a fundamental problem with the petitioner's claim, even taking Mr. Bowman's affidavit as true. The affidavit provides that the information came to Mr. Bowman's attention in February 1990. The original indictment against the petitioner was returned in December 1989. However, the trial court dismissed that indictment and ordered that any resubmission of the case occur before a new grand jury to be selected on March 1, 1990. The indictment under which the petitioner was tried and convicted was returned on March 12, 1990. Any tainting of the grand jury returning the original indictment could not carry over to the new grand jury and new indictment. The petitioner has not specified how this claim could result in relief from his conviction.

Other than previously noted, the petitioner's brief does not point to any evidence showing the ineffective assistance of counsel. We have reviewed the record and the various claims of ineffective assistance of counsel presented by the petitioner at both his new trial and post-conviction hearings. The post-conviction court made detailed findings regarding the petitioner's claims about counsel. It found in many of them that Mr. Bowman's conduct was reasonable and tactical in nature. It found no prejudice to the petitioner from Mr. Bowman's actions or lack thereof. In this respect, the court concluded that there was no probability that an appeal on the issue of ineffective assistance of trial counsel would have been successful. We agree. We see nothing in the record that entitles the petitioner to relief from his convictions and sentences based on his claim of the ineffective assistance of counsel at trial or on appeal.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
JOSEPH M. TIPTON, JUDGE